IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TONYA C. HUBER,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>WESTAR FOODS, INC.,<br><br>　　　　　　Defendant. | 8:21CV229<br><br>MEMORANDUM<br>AND ORDER |

This matter is before the Court on three separate motions: a Motion for Summary Judgment filed by defendant Westar Foods, Inc. ("Westar") (Filing No. 38), a Motion for Partial Summary Judgment filed by plaintiff Tonya C. Huber ("Huber") (Filing No. 41), and Huber's Motion to Strike (Filing No. 55). For the following reasons, Westar's Motion for Summary Judgment is granted. Huber's motions are both denied.

I.　BACKGROUND

　　A.　Huber's Employment with Westar

Westar owns and operates seven Hardee's fast-food restaurants in Nebraska. Westar hired Huber as a store manager for their Elkhorn, Nebraska, location (the "Elkhorn store") in December 2018. Huber's responsibilities included "hiring, training, and discipline of crew members, managing the crew, overseeing costs, and maintaining the store." Huber was also responsible for ensuring the Elkhorn store was opened at 5:00 a.m. each morning. She was expected to work fifty hours per week.

Huber received Westar's employee handbook when she was hired, including Westar's attendance policy (the "attendance policy"). The attendance policy stated that an employee who would be late or absent must "call the management person in charge immediately so that enough time is given to cover [the employee's] position." An employee was expected to call "at least two-hours before [their] work shift [began] when

possible." The attendance policy further specified the employee "must call and speak directly to the management person in charge" and that "[t]exting, emailing or leaving a message" were unacceptable ways to communicate tardiness or absences.

While working for Westar, Huber reported to three separate district managers at different times: a person named Stacy; Matt Thayer ("Thayer"); and Cindy Kelchen ("Kelchen"). On January 10, 2019, Huber received an "employee coaching tool," which reminded Huber of the need for her to communicate scheduling changes in accordance with the attendance policy.

On October 30, 2019, Huber became ill with the stomach flu and missed all or part of her work shift. She sent a text message to a group of managers about her absence. The next day, her illness caused her to leave work early. Huber contends she also called her then-manager Kelchen, who "did not answer," but Kelchen denies ever receiving a call from Huber. Regardless, both parties agree Huber was disciplined through a formal write-up for violating the attendance policy.[1] They also agree that after Huber's write-up, Kelchen "sat down with Huber and discussed the importance of following the company's" attendance policy.

B.  **December 2019 Medical Incident**

Huber was diagnosed with diabetes a few months after starting her employment with Westar. She required a daily insulin shot to manage the disease. She left her insulin at home on workdays until September 2019, when she began storing it in a safe in the Elkhorn store without issue. Huber contends she previously asked both Thayer and Kelchen about insulin storage in the workplace but received no assistance; Kelchen

---

[1] Huber disputes that she actually violated the attendance policy in October 2019 but admits she was disciplined. The write-up form stated Huber was disciplined for failing to call Kelchen about the absences as required by the attendance policy. In a written comment on the write-up form, Huber stated only: "I did send a group text to all [district managers and Kelchen] asking for help."

denies the conversation occurred and Thayer does not recall. Huber never discussed insulin storage with Amy Rowe ("Rowe"), Westar's human resources representative.

Early in the morning of December 20, 2019, Huber was scheduled to open the Elkhorn store. In the days before, she had not been feeling well and "knew something was off." She did not make it to work that day. Instead, she drove herself to a nearby clinic and learned she was having a diabetic episode with low-blood-sugar levels. She spent the rest of the day receiving medical treatment at the clinic, including medication intravenously.

Huber spoke on the phone with her then-boyfriend, Richard Grondin ("Grondin"), several times throughout that morning and day. One call lasted around forty-five minutes. Huber says she does not remember the calls because the diabetic episode impacted her cognition and consciousness. She also spoke with her son, Trey Huber ("Trey"), to tell him she was at the doctor's office. Trey described Huber's communication as "all over the place" and said he found it difficult to understand her.

Huber never called Kelchen on December 20th to discuss her illness or absence. After Kelchen was unable to reach Huber that day, she called Trey, who informed Kelchen his mother was at the doctor's office or hospital. That night, Grondin drove Huber home from the clinic, and Huber "slept for most of the night into the next day."

The next morning, Huber was again scheduled to open the Elkhorn store at 5:00 a.m. She called Kelchen around 7:45 a.m. and spoke to her for the first time about her medical incident. According to Huber, "[h]er call to Kelchen was her first interaction upon awakening from her post-sedation sleep." Huber gave Kelchen some details about her health condition and follow-up care.

Following the call, Huber sent Kelchen a copy of a doctor's note which stated: "Please excuse patient from work due to illness through 12/26/19." The note gave no further details.

Kelchen contends she then "relayed the events of the past two days to" Frank Westermajer ("Westermajer"), President of Westar, after her call with Huber. Westermajer claims he made the decision to terminate Huber at that point, after "learning of the events from Kelchen and conferring with Rowe." Rowe drafted Huber's termination letter.

The next day, Huber emailed Kelchen and Rowe to request "family medical leave paperwork for [her doctor] to fill out." After receiving no response, Huber sent a second email requesting the paperwork on December 23rd. On December 24th, Huber emailed an updated doctor's note to Kelchen and Rowe excusing Huber from work through January 2, 2020 for "acute illness, hypoglycemia, fever and debility." In response, Rowe attempted to schedule a phone call with Huber, but Huber stated she was "still not well enough to have a work related conversation."

Westar then terminated Huber effective December 26, 2019. The termination letter cited Huber's "fail[ure] to follow the Company's notice procedures for [her] absences on December 20, 2019 and on December 21, 2019." The letter also stated her absences would "not be covered under the Family Medical Leave Act of 1993" because Huber "failed to provide notice as soon as possible and practical" and "did not request any need for an accommodation until after the unscheduled absences."

On June 17, 2021, Huber filed this lawsuit (Filing No. 1), asserting claims for disability discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Nebraska Fair Employment Practice Act ("NFEPA"), Neb. Rev. Stat. § 48-1101 *et seq*. Huber alleges Westar fired her "[f]ollowing reasonable requests for accommodation" and "[a]fter learning of [her] history of disability." Huber also brings interference and retaliation claims under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*

4

The parties filed cross-motions for summary judgment on September 9, 2022. Westar asks for "entry of summary judgment on all claims." Huber seeks partial summary judgment as to Westar's "affirmative defenses of failure to mitigate damages and after-acquired evidence." Huber also moved to strike two affidavits submitted by Westar in opposition to Huber's motion for partial summary judgment, arguing they "contain expert testimony" that was not timely disclosed. All three motions are now ripe for review.

## II. DISCUSSION

### A. Legal Standards

On cross-motions for summary judgment, the Court considers each motion separately, "viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant." *Corkrean v. Drake Univ.*, 55 F.4th 623, 630 (8th Cir. 2022) (quoting *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1033 (8th Cir. 2007)). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"The 'mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law.'" *Corkrean*, 55 F.4th at 630 (quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). A genuine dispute exists only "if there is enough evidence 'that a reasonable jury could return a verdict for the nonmoving party.'" *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

At the summary-judgment stage, the Court "does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Walz v. Randall*, 2 F.4th 1091, 1099 (8th Cir. 2021) (quoting *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008)). "To defeat summary judgment, 'the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"

5

*Carter v. Atrium Hosp.*, 997 F.3d 803, 808 (8th Cir. 2021) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

      B.      **Westar's Motion for Summary Judgment**
      1.      **Discrimination Claim**

Huber claims there are material factual disputes regarding whether "Westar discriminated against [Huber] based on her disability" in violation of the ADA and NFEPA.[2] *See* 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability"); Neb. Rev. Stat. § 48-1107.01 (stating it is unlawful for a covered employer to "[d]iscriminate against a qualified individual with a disability because of the disability"). An employee can establish disability discrimination in one of two ways: through "direct evidence of disability discrimination" or through indirect evidence by "apply[ing] the burden-shifting framework" from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 544 (8th Cir. 2018).

"Direct evidence includes 'evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude,' where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor." *Id.* at 543 (quoting *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006)). Huber argues she "has presented direct evidence of disability discrimination."[3]

---

[2]Because NFEPA's disability-discrimination provision is "patterned after the ADA" and "the statutory definitions of 'disability' and 'qualified individual with a disability' contained in the NFEPA are virtually identical to the definitions of the ADA," the Court's analysis of Huber's ADA claim also applies to her NFEPA claim. *Ryan v. Cap. Contractors, Inc.*, 679 F.3d 772, 777 n.3 (8th Cir. 2012) (quoting *Orr v. Wal-Mart Stores, Inc.*, 297 F.3d 720, 723 (8th Cir. 2002)).

[3]Huber's complaint and summary-judgment briefing both mention Huber's "requests for accommodation" and Westar's denial of her requests. Her brief also states that Kelchen did not "engag[e] in an interactive process" with Huber. However, Huber's

Huber points to incidents she characterizes as showing Westar's "history of acting with contempt towards her requests for accommodation" and "Westar's anger towards [her] regarding her disability and need for accommodation." She states that her two previous managers, Thayer and Kelchen, rejected her requests for help with insulin storage at the Elkhorn store. Huber testified that Thayer told her the insulin storage was a "[Huber] problem, not a [Thayer] problem." She further testified Kelchen suggested freezer storage, and when Huber told her that would not work, Kelchen replied, "I don't know what to tell you." Huber also said Kelchen suggested Huber "do time management better" when Huber asked for assistance to ensure she could eat during her shifts. Kelchen and Thayer dispute or do not recall those interactions. Finally, Huber points to testimony showing Kelchen was "irate" in her December 21st phone call with Huber after learning of Huber's "diabetic episode and need for time off" immediately before Westar's decision to terminate Huber.

In response, Westar argues "Huber's characterization of alleged contempt or anger do not show direct evidence of discrimination." Westar contends that even if the "conversations did occur" as Huber stated, they do not provide a strong causal link between the "discriminatory bias" and Huber's termination. Westar points out that Kelchen and Thayer were "not decision makers" whose statements can be direct evidence of discrimination.

"Direct evidence of employment discrimination must be distinguished from stray remarks in the workplace, statements by nondecisionmakers, or statements by

---

brief focuses on proving the elements of a disparate-treatment claim rather than a reasonable-accommodation claim. *See Nahal v. Allina Health Sys.*, 842 F. App'x 9, 10 (8th Cir. 2021) (per curiam) (discussing the "modified burden-shifting analysis" required for a reasonable-accommodation claim); *Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 941 (8th Cir. 2019) (same). Because Huber does not discuss or analyze the elements of a reasonable-accommodation claim, the Court concludes her only disability-discrimination theory is a disparate-treatment claim.

decisionmakers unrelated to the decisional process." *Quick v. Wal-Mart Stores, Inc.*, 441 F.3d 606, 609 (8th Cir. 2006) (citing *Clearwater v. Indep. Sch. Dist. No.* 166, 231 F.3d 1122, 1126 (8th Cir. 2000)). Huber points to the conversations with Kelchen and Thayer as direct evidence. Yet neither Kelchen nor Thayer were "decisionmakers," and neither made the ultimate decision to terminate Huber—Westermajer did. Further, the statements from Kelchen and Thayer about her insulin and lunch breaks occurred months before she was terminated. There is insufficient direct evidence to "show a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action." *Button v. Dakota, Minnesota & E. R.R. Corp.*, 963 F.3d 824, 832 (8th Cir. 2020) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1045-46 (8th Cir. 2011) (en banc)).

Because the record does not show direct evidence of disability discrimination, the Court turns to the *McDonnell-Douglas* burden-shifting framework. Huber can establish a prima facie case by showing she "(1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment action because of [her] disability." *E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 969 (8th Cir. 2014) (quoting *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013)).

If Huber establishes a prima facie case, the "burden of production then shifts to [Westar] to show a legitimate, nondiscriminatory reason for the adverse action." *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016). If Westar produces such evidence, "the burden of production shifts back to [Huber] to show the proffered reason was mere pretext for intentional discrimination." *Farver*, 931 F.3d at 812. Huber "at all times bears the 'ultimate burden of persuasion.'" *Heisler v. Nationwide Mut. Ins. Co.*, 931 F.3d 786, 794 (8th Cir. 2019) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

The Court assumes without deciding that Huber has established a prima facie case of disability discrimination. *See Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 740 (8th

Cir. 2017) ("The burden to show a prima facie case is not difficult." (quoting *Musolf v. J.C. Penney Co.*, 773 F.3d 916, 918 (8th Cir. 2014))). Still, Westar gives legitimate, non-discriminatory reasons for terminating Huber,[4] so Huber must meet her "ultimate burden" of producing evidence showing Westar's "justifications are mere pretext." *Torgerson*, 643 F.3d at 1046. "[P]roving pretext . . . 'requires more substantial evidence than it takes to make a prima facie case' and 'evidence of pretext and discrimination is viewed in light of [Westar's] justification." *King v. Guardian ad Litem Bd.*, 39 F.4th 979, 987 (8th Cir. 2022) (quoting *Phillips v. Mathews*, 547 F.3d 905, 912-13 (8th Cir. 2008)).

There are at least two ways in which Huber can "demonstrate a 'material question of fact regarding pretext.'" *Gardner v. Wal-Mart Stores, Inc.*, 2 F.4th 745, 748 (8th Cir. 2021) (quoting *Torgerson*, 643 F.3d at 1047). She can show that Westar's "explanation is unworthy of credence . . . because it has no basis in fact," or "persuad[e] the court that a prohibited reason more likely motivated" Westar. *Id.* (quoting *Torgerson*, 643 F.3d at 1047). Ultimately, to survive summary judgment she "must point to enough admissible evidence to raise genuine doubt as to the legitimacy of [Westar's] motive." *Thompson v. Univ. of Ark. Bd. of Trs.*, 52 F.4th 1039, 1042 (8th Cir. 2022) (quoting *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014)).

Huber argues the evidence shows she "followed Westar's policy." Huber insists she never actually violated Westar's attendance policies—either in October 2019, when she received a write-up, or during her December 20th and 21st medical incident. She asserts that this, combined with Westar's "history of acting with contempt" toward her diabetes, are enough that a reasonable juror could find Westar's explanation is a pretext.

---

[4]Huber does not appear to dispute that Westar met its burden to present proof of a non-discriminatory, legitimate justification for Huber's termination. This burden is "not onerous," *Torgerson*, 643 F.3d at 1047, and the Eighth Circuit "has 'consistently held that violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee.'" *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014) (quoting *Twymon v. Wells Fargo & Co.,* 462 F.3d 925, 935 (8th Cir. 2006)).

9

Huber has not put forth sufficient evidence that she did not violate the attendance policy on either occasion. But even if she had, it would still be insufficient to overcome summary judgment. She "must present sufficient evidence that [Westar] acted with an intent to discriminate, not merely that the reason stated by [Westar] was incorrect." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012). She would need to show that Westar "did not truly believe [she] violated company rules." *Id.* Huber has not adduced sufficient evidence disputing Westar's good-faith belief that she violated the attendance policy on both occasions.

Huber does not dispute she was previously disciplined for violating Westar's attendance policy. She also does not deny that she did not call Kelchen at all on December 20th when she missed work because of her medical incident. She does not contest that the day of the medical incident, she drove herself to the clinic, spoke to Grondin on the phone several times, and spoke to Trey. Finally, she does not dispute that when Westar made the decision to terminate her, Kelchen knew that (a) Huber drove herself to the clinic on December 20th, and (b) called Trey on December 20th.

Ultimately, Huber "must do more than simply create a factual dispute as to the issue of pretext; [she] must offer sufficient evidence for a reasonable trier of fact to infer discrimination." *Vinh v. Express Scripts Servs. Co.*, 7 F.4th 720, 727 (8th Cir. 2021) (quoting *Wilking v. County of Ramsey*, 153 F.3d 869, 874 (8th Cir. 1998)). She has not done so. There is no genuine dispute that Westar had a good-faith belief Huber violated the attendance policy. Huber does not point to any evidence indicating Westermajer—who made the decision to terminate her—had discriminatory animus. Any discussion of Westar's "contempt" toward Huber's disability is largely "speculation and [Huber's] own suppositions." *Brandt v. City of Cedar Falls*, 37 F.4th 470, 481 (8th Cir. 2022).

2. **FMLA Claims**

The FMLA entitles an eligible employee to twelve weeks of leave during a twelve-month period if she has "a serious health condition that makes [her] unable to

perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "An employee can bring three types of FMLA claims against her employer: interference, retaliation, and discrimination." *Corkrean*, 55 F.4th at 630. Huber brings claims for interference and retaliation.

### a. FMLA Interference

In an "interference" claim, an "employee alleges that the employer denied or interfered with her substantive rights under the FMLA." *Brandt*, 37 F.4th at 478 (quoting *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011)); *see also Corkrean*, 55 F.4th at 630 (explaining it is "unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise rights provided under the FMLA." (citing 29 U.S.C. § 2615(a)(1))).

To succeed on her interference claim, Huber must show "she was eligible for FMLA leave, the employer knew she needed FMLA leave, and the employer denied her an FMLA benefit to which she was entitled." *Smith v. AS Am., Inc.*, 829 F.3d 616, 621 (8th Cir. 2016) (citing *Hasenwinkel v. Mosaic*, 809 F.3d 427, 432 (8th Cir. 2015)). FMLA interference can include "refusing to authorize FMLA leave,'" *id.* (quoting *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006)), or "terminating an employee while on FMLA leave," *Lovland v. Emps. Mut. Cas. Co.*, 674 F.3d 806, 811 (8th Cir. 2012).

The parties primarily disagree on the second element: whether Westar had the proper notice that Huber needed FMLA leave. An employee "need not . . . mention the FMLA" to seek leave for the first time, as long as the employer has "sufficient information . . . to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b).

In Huber's view, the evidence shows Kelchen had notice of Huber's need for FMLA after their December 21st phone call. Huber points to Kelchen's personal notes

11

about the call, where Kelchen writes that Huber said her "diabetic [sic] was off" and she "was having a serious medical happening," where she was "not making sense" and "[couldn't] concentrate." The notes also show Huber informed Kelchen she had a "follow up on Monday."

To Westar, the timing of the call, rather than the content, warrants summary judgment. In the event of a medical emergency, FMLA notice must be provided "as soon as practicable," 29 C.F.R. § 825.302(a), typically "the same day or the next business day," *id.* § 825.302(b). An employee generally must comply with the "employer's usual and customary notice and procedural requirements for requesting leave." *Id.* § 825.302(c). However, when an employee requires emergency medical treatment, she is not "required to follow the call-in procedure until [her] condition is stabilized, and [she] has access to, and is able to use, a phone." *Id.*

Westar points to several undisputed facts to argue Huber did not call Kelchen or otherwise provide notice to Westar "as soon as practicable." It is undisputed that Huber did not call Kelchen until 7:45 a.m. on December 21st, after experiencing a medical incident on December 20th that resulted in an unexplained work absence. Westar notes that on the morning of December 20th, "Huber admittedly was able to call her then-boyfriend [Grondin]. . . and talked to him for 45-minutes, prior to driving herself to the doctor's office." She spoke to Grondin "multiple times" that day, yet "failed to attempt to contact Kelchen." Further, it is undisputed that Huber called Trey while she received medical treatment. In Westar's view, this evidence shows "Huber would have indisputably been capable of calling into [sic] Westar on the morning of December 20 to provide it with notice."

Even if there are fact issues regarding Huber's entitlement to FMLA leave, Huber cannot prove FMLA interference if Westar's "reason for dismissal is insufficiently related to FMLA leave." *Stallings*, 447 F.3d at 1051. "Termination is actionable under FMLA only if the employee was discharged *because of* her FMLA leave." *Hasenwinkel*,

12

809 F.3d at 433 (emphasis added). In other words, "an employer who interferes with an employee's FMLA rights will not be liable if the employer can prove it would have made the same decision had the employee not exercised the employee's FMLA rights." *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005); *see also Bacon v. Hennepin Cnty. Med. Ctr.*, 550 F.3d 711, 715 (8th Cir. 2008) (affirming summary judgment on FMLA interference claim where employee failed to follow employer's "call-in policy" while on FMLA leave).

Westar argues and submits evidence showing Huber was "lawfully terminated for reasons wholly unrelated" to any FMLA request. In response, Huber contends her December 20th and 21st absences "were protected by FMLA, and thus could not be lawfully used as a basis for . . . termination." This circular reasoning is unconvincing. Westar has submitted evidence showing it terminated Huber because of its good-faith belief she violated Westar's attendance policy, not because of the absences themselves.

To survive summary judgment, Huber must adduce sufficient evidence to permit a reasonable juror to find in her favor "on more than mere speculation, conjecture, or fantasy." *Bharadwaj v. Mid Dakota Clinic*, 954 F.3d 1130, 1137 (8th Cir. 2020) (quoting *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011)). Even viewing the evidence in the light most favorable to her, Huber has not met this burden.

### b. FMLA Retaliation

A FMLA retaliation claim is one "where the employee alleges that the employer discriminated against her for exercising her FMLA rights." *Brandt*, 37 F.4th at 478 (quoting *Wierman*, 638 F.3d at 999). As with Huber's disability-discrimination claim, FMLA retaliation is evaluated under the *McDonnell-Douglas* burden-shifting framework, *see Wierman*, 638 F.3d at 999, and Huber retains the ultimate burden of "demonstrat[ing] that [Westar's] proffered reason is pretextual." *Corkrean,* 55 F.4th at 631 (quoting *Mitchell v. Iowa Prot. & Advoc. Servs., Inc.*, 325 F.3d 1011, 1013 (8th Cir. 2003)).

The parties' pretext arguments are basically the same as those made for the discrimination claim. Huber contends she was fired because "Kelchen was angry [she] required FMLA leave to get treatment for a serious health condition," and that Westar citing the attendance policy is "nothing more than an excuse to conceal its real motivation." Westar, in turn, argues that "[b]eyond the fact that Hubar requested FMLA prior to her being notified of her termination," there is no evidence to suggest Westar's stated reason for her termination is untrue.

The Court reaches the same conclusion it did with Huber's discrimination claim. "[D]rawing all reasonable inferences in [Huber's] favor, [she] has failed to provide any record evidence to show that defendants' proffered reason for her termination 'was not the true reason, but rather a pretext for discrimination.'" *Brandt*, 37 F.4th at 481. *See also Corkrean*, 55 F.4th at 632 (explaining that in the FMLA retaliation context, "evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002)).

IT IS ORDERED:
1. Defendant Westar Foods, Inc.'s Motion for Summary Judgment (Filing No. 38) is granted.
2. Plaintiff Tonya C. Huber's Motion for Partial Summary Judgment (Filing No. 41) and Motion to Strike (Filing No. 55) are denied.
3. This case is dismissed with prejudice.
4. A separate judgment will issue.

Dated this 17th day of January 2023.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge